The final case for argument this morning on our calendar is Levson v. Aqualife. May I proceed, Your Honor? Yes, please. May it please the Court, my name is Joseph Labuda and I represent the appellants, cross-appellees in this appeal. In this case, the jury found estoppel. And estoppel means something. It's a bar that prevents... You say it means something, but I read the jury instructions. It wasn't sure to me what it meant. There was very little in that instruction, right? Well, the instruction says that the doctrine of estoppel applies to sworn statements made to administrative agencies. And pursuant to the IRS regulations, which were at play here, tax returns are sworn statements made under the penalty of perjury. And it goes on further to say, in determining whether plaintiffs Levson and Siegel are stopped from making claims for wages and overtime, you may consider whether plaintiffs Levson and Siegel swore to the IRS that they were independent contractors and not employees. So the jury was asked to find if they made this oath, and if so, there's estoppel. That's the elements of estoppel are making a representation to an agency. That's all you need for estoppel? For estoppel, you need to have two things. What kind of estoppel are you talking about? With respect to judicial estoppel, you have to have a sworn statement, and I think that's clear here. We had in the record were the tax returns that indicated that the plaintiffs had submitted tax returns for their corporations. They received 1099s. A sworn statement. Yep, so you have sworn statements. What else do you need? And then you need to have an adoption by administrative agency. In this case, you had the IRS that adopted. In fact, there was evidence that on occasions, even though the plaintiffs had earned over $100,000, that they actually received a tax refund from the IRS, so they paid absolutely no taxes. So the IRS accepted those IRS filings year after year. What are the cases you're relying on that say an IRS tax return is enough to stop somebody from bringing a Fair Labor Standards Act claim? Well, you have analogous cases. We searched. We did not see any case filings with respect to tax returns, but in this circuit, you have the Safe Flight decision, which is analogous, and there's analogous cases with respect to the ADA claims. Why do you say it's analogous? Well, you have a situation in Safe Flight where all that happened was that a plaintiff had submitted an application for disability, and based on that application, there was no proceeding, there was no trial, anything like that. Based on that application and sworn statement, that was adopted by the agency, Social Security, and he received benefits for that. And that's judicial proceeding, right? It's a quasi-judicial proceeding. It's an administrative proceeding before an administrative law judge, right? No, there was no proceeding whatsoever. It was just an application, and I would say it's analogous with respect to an application or a tax return where you're making a sworn statement to a government agency. The IRS is a government agency. The Social Security Administration is an agency as well. And so with respect to those two, so I think it's analogous with respect to the fact that in Safe Flight and also in Mitchell, this court has consistently held that when you make a sworn statement to an agency, to an administrative branch, and that's been adopted, then that is going to constitute estoppel. And the jury found that. The jury also awarded or made inconsistent findings about whether Siegel and Leifson were entitled to be compensated, and they focused on, it appears in the evidence in the record, about hourly wages that they punched in and out as they arrived and left the office. They performed clerical and telemarketing work with expectations of hours. And, you know, if a record suggested that an employer required its people working at its place of business to sign an agreement, calling themselves an independent contractor, and people went ahead and filed their tax returns on that basis, nonetheless the economic realities are to the contrary, are more in line with established case law about who is an employee versus who is a contractor. Why should we ignore all of those additional facts and focus solely on whether a tax return was filed, characterizing oneself as an independent contractor in line with what your employer required? Right. And Judge Weinstein in lower court addressed that issue, and he applied what we consider to be the independent contractor employee test, where it's one factor, the tax returns are one factor to determining whether or not somebody is an employee versus an independent contractor. But that's not the question that was posed to the jury. The question that was posed to the jury is even if you think that they were employees, should they be stopped because they continued year after year of holding themselves out to the IRS with sworn statements saying, I am not an employee of Aqua Life. I am an employee of my own company. We know what the tax returns. Yes. The verdict form has a handwritten note. The question is handwritten. It was an afterthought. Has estoppel been proved? In your view, is judicial estoppel a jury question? We believe that it is. It's a factual issue. It was something that was posed to the jury. There was no objection of that by the plaintiffs, and we believe if that was an issue, that that issue was waived by the plaintiffs. It was squarely presented by the lower court to the jury to make that determination. What we believe the error was, was that when you have estoppel, and there's clearly a finding of estoppel by the jury, the application of that prevents . . . You're relying on the language that Judge Sullivan just pointed to, the handwritten note on page 34 of the jury. Yes. That's their finding of estoppel. In this case, the jury really grappled with this issue of independent contractor employee and what to do. That's not an issue of independent contractor employee. That's an issue of estoppel. I should say . . . No, no. The jury didn't find that they were independent contractors. The jury rejected that they were independent contractors, right? They determined that they were employees. They checked no for independent contractors. Yes. Right. What the jury did grapple with was whether when they found estoppel, and that was a note that the jury had provided, whether or not they are precluded from awarding wage claims to the plaintiffs. And Judge Weinstein said that they were allowed to do that, which we believe was an error. So . . . So that deals only with the Fair Labor Standards Act claims, right? That has to do with the Fair Labor Standards Act and the New York labor law claims, Your Honor. There are some other points you wanted to make. Yes. Yes. Yes. Okay. You have 59 seconds. Yes. Yes. So with respect to the breach of contract claims, we believe that the court properly vacated the jury award there. In this case, as employees, there were payments that were made to these individuals. They continued week after week to receive those payments. The acquiesced, even though there may have been complaints, years and years and years of acquiescence and . . . But they didn't know. Isn't that the point? I mean, isn't it the fact that they were . . . I mean, the testimony showed that these were sometimes characterized as advances, sometimes characterized with nothing. It wasn't clear whether they were getting a partial payment in advance, whether the terms had changed or it was just being delayed. Isn't that all . . . wouldn't that support, then, the finding of Judge Weinstein? The evidence was clear that, with respect to the 35 percent that they were told that those deductions were being made, and they protested, but they continued to work. And the same thing with the 10 percent, as well as the 5 percent residual, which we believe is subject to the statute of frauds, which Judge Weinstein also found as well, because it was, from the plaintiff's perspective, in perpetuity payment. It was a pension for them. And so, we believe . . . What is your basis . . . what's the record basis for your claim that the defendants paid Leifson and Siegel for all the hours they worked? I'm thinking of the same kind of ambiguity in the record that Judge Sullivan is pointing to, and my own sense from the law that the burden really falls on the employer to keep accurate records of who he or she is paying and for exactly what. And the jury found to the contrary here in its award that they had not been paid fully. You called it a grave mathematical error in what they awarded, but I don't see the record basis for a holding that they were paid for all the hours they worked. Well, with respect to the calculations, what the judge had instructed the jury to do is, if they determined that there was overtime due, that they . . . he should award them . . . the jury should award half-time, because they had been paid for the hours that they worked, but not the additional half-time for hours over 40. And when you slice it or dice it any which way with respect to the jury's calculations, it doesn't make any sense. It never comes out to that half-time calculus, which is what they were instructed to do. Okay. So, you're . . . I have . . . Go ahead, Judge Hall. Judge Hall, please. One more line of questions, Counsel. Could you just reprise for me at least, please, the argument with respect to the absence in the judgment . . . in the motion for judgment as a matter of law, of any challenge to the 10 percent commissions? With respect to the 10 percent . . . Your Honor, if you could just clarify that for me a little bit. Was an argument made . . . I will try to put it better. Was an argument made in the motion for a judgment as a matter of law that challenged the jury's award of 10 percent commission? You know, the . . . 10 percent commission. One, I believe it was, and this is just based on my memory. I will say also that the jury verdict did not parse out between the 35 percent, the 5 percent and the 10 percent, although it was requested in order to make things a little bit more clear in terms of any type of appeal. But, there isn't any type of segregation by the jurors in terms of 35 percent, 10 percent, 5 percent. And so, it is quite muddied, I would say. But, I believe that we did assert and address all the different components of the commission claims. Very good. Thank you. I think you've reserved three minutes for rebuttal. Yes. Yes, thank you. And so, we'll hear from Ms. Sobel. Good morning, Your Honor. My name is Svetlana Sobel, and I represent all of the plaintiff . . . appellees, cross-appellants in this action. Simply put, this Court has for a very long time considered jury verdicts uncontrovertible where . . . they can prove that their verdict was of sheer surmise and conjecture without any actual evidence to support it. This is not the case in this matter. Simply put, because this jury sat for three weeks, listened diligently to multiple witnesses, deliberated for four days, using calculators to arrive at their calculations. They evaluated the witnesses that did appear, and they evaluated the witnesses that did not appear. Or, for example, defense counsel produced witnesses that appeared and then were directed by Judge Weinstein to come back later to produce evidence that they were purporting to testify about and then failed to return. The credibility was properly evaluated by the jury. Credibility of witnesses and the calculation of damages was properly evaluated by the jury as well. And absent exceptional circumstances, such determinations should not be overturned. Turning to the point briefly of estoppel, I noticed the Court was interested in this particular issue. And for the concept of judicial estoppel, we need not only a sworn statement, but we need a prior proceeding . . . where the statement being made in a present proceeding is contrary to the prior statement. That, simply put, is not an issue here. There was no prior sworn statement contradictory to the statements that were made in this case that would be applicable. Secondly, equitable estoppel would require a written statement to the employer that induced detrimental reliance. Again, defendants fell very short of that burden. There was no statement. The only items that were produced were the ones that defendants didn't shred and didn't show any kind of written statement that in any way induced reliance by defendants. Basically . . . What was the point of the instruction then? I don't understand. Are you saying that the jury wrongly found estoppel? I believe . . . Are you saying they were wrongly instructed on estoppel? What are you saying? Your Honor, I believe even if estoppel was to be proven, the key question . . . Well, it apparently was proven. The jury checked that it was proven. It was an affirmative defense. It's listed as an affirmative defense. The jury checked the box. And then there's nothing on the verdict form that says if you check one of the affirmative defenses, don't do damages. So, they went ahead and did damages anyway. But I'm just curious. Are you saying that the instruction on estoppel was erroneous? Without addressing the instruction on the estoppel, Your Honor, if I may just notice that even though the jury found estoppel, putting aside the issue that they didn't find a judicial or equitable estoppel, that wasn't defined. They were asked to. They nonetheless were allowed, pursuant to the instructions, find damages for the plaintiffs, pursuant to the instructions that said that they may consider the tax return issue, such as the estoppel, purported estoppel, in consideration, in addition to the other items under the economic reality rule. I think the most important issue is whether the estoppel is applicable against the plaintiffs to benefit the defendants. And here the situation is simply not as such. There was no statements made to the defendants in any way inducing reliance as far as equitable estoppel is concerned. And there was no prior proceeding. Even if we were to consider the tax returns, sworn statements given to the IRS, there is no prior proceeding with the IRS. This is just a filing. There was no investigation. There was no audit. There was no statements made in a prior proceeding. And there was definitely no prior court proceeding. Turning to a different topic, if I might, with regard to commissions earned by Ms. Leibson and Siegel, the jury awarded substantial sums to them both. The district court reversed the jury award, saying that the plaintiffs had assented to the modified terms of their at-will contracts by continuing to work on this basis over time. I wonder if you could explain more why you think the district court was wrong in finding that there was an assent by both of them in continuing to work under those terms. And actually, I have the same question with regard to the commissions paid to Pustov and Leibson on a net basis versus a gross basis. All of these folks continued to work under very ambiguous circumstances over extended periods of time, and the judge was concerned about the implications of their continuing. Thank you, Your Honor. See if you could explain. Absolutely. I'll do my best. Simply put, in this particular case, there's two different commissions that are at issue, as Your Honor certainly pointed out. The portion where the 35 percent was due to the corporate plaintiffs, and there were deductions. If you take a look at the verdict, it's clear the jury did not award any of the deductions that were being sought. As far as the corporate plaintiffs for commissions, the only award that was given was for the residual 5 percent commissions based on the maintenance contracts. And that's what the judge said was incorrect because of the statute of frauds, right? Yes, ma'am. Because that was forward-looking. Yes, ma'am. The portion of the commissions that were due to Ms. Leibson and Ms. Siegel, however, the 10 percent based on the work with the technical department and sales, was not in any way ratified or waived or modified. Simply put, for ratification, an individual needs full knowledge of all material facts. There was never any even claim by defendants that they paid in full for these commissions. There was much less any evidence produced other than admitting on the record that they shredded documents that related to any way figuring out how commissions were calculated and based on what. But again, the plaintiffs both continued to work, having never had a true-up and having some general idea that maybe this was partial, but there was no written contract on which to base that assumption. So why was it wrong for the district court to say, listen, you lived with this for a long time, and we're going to strike the jury's finding? It was improper in the sense that, like I said, there was no full knowledge of all material facts by Ms. Leibson. What facts were they not aware of? What facts? They were not aware of exactly how much they were owed because they were denied access to the information. That information was an exclusive control and possession of the defendants, and they were, despite repeated requests, denied such access. So while they felt that they were due additional funds, they had no way to delineate exactly how much and based on which dates and performance of which sales and of services. Is that true with respect to deductions as well? They were not aware of what was being deducted? Are you referring to the deductions from the 35 percent commissions to the corporate plaintiffs? Yes. That was also very difficult to ascertain. They were not aware 100 percent of what was owed, and there was, as far as the 35 percent is concerned, there was a dispute between the corporate plaintiffs and the defendants because the corporate plaintiffs claimed that they were due 35 percent from a gross, whereas the defendants were claiming no from net, and that was the issue there. But again, corporate plaintiffs never had the ability to obtain full records of what all their sales and everything were. Now, to point out why they would continue working, why the lower court made the mistake, Plaintiffs Siegel and Leifson were in the position where their respective spouses were also employed by defendants. With Ms. Leifson, Mr. Leibsohn was employed through Matana, and at the time when Ms. Leifson started working on August 1, 2011, in this capacity, Mr. Leibsohn had a heart attack, and during his recovery, she was the only wage earner. So for her to abandon the only job that she has when he's recovering from a heart attack was untenable, and basically defendants took advantage of it and said, well, you can work for what we're paying you, or you can go find a job somewhere else. The same happened repeatedly with Ms. Siegel. Thankfully, her husband did not have a heart attack, but what happened was he was also working through VATCAT in his capacity, and whenever Ms. Siegel would raise the issue of, I believe you owe me more money, I believe you're not paying me in full, all of a sudden any service calls that would go to Mr. Siegel disappeared. So VATCAT all of a sudden stopped being able to make money because Ms. Siegel requested to be paid in full. And lastly, I just want to point out that the 10% commissions were not specifically addressed by Judge Weinstein in the ratification portion. Were they raised by counsel in the motion? Yes, Your Honor. It was broken down specifically which commissions were being sought. The 5% residual, the deductions from the 35%, and the 10% from Ms. Lisa and Ms. Siegel, and I believe it's extremely important to point out there was never one check, and I've rused over and over again the hundreds of checks that ever said paid in full for any, whether they purported to be for a particular month or a particular service, every single check said partial or advanced, including the check issued to Ms. Siegel after she no longer worked with Aqualife Defendants. The very last check that was issued to her says in the memo section, deposit for final. So how, at which point could she possibly have been held to ratify or assent to continued failure to pay until after that final check when no further checks were forthcoming? Could I ask one other question? In the district court's opinion on pages five and six, he says that with regard to Ms. Leibson, the jury awarded her $25,680 for hourly compensation, and then he says that under the FLSA and New York labor law, they awarded her $25,680 for overtime pay. And the same parallelism he recites in a different dollar amount for Ms. Siegel, $48,320 for hourly compensation and then $48,320 for overtime pay. Are those meant to cover the same hours or are those separate sums for separate considerations? I couldn't understand whether they were duplicative or whether they meant something else. Could you describe or help me understand? I may. Please. It's on SPA five and six. Maybe it comes out in the wash with the final damages chart, but I wondered whether you understood the jury to be awarding these unusual, very precise sums separately for different compensation elements? Do you see where I'm referring to? Yes, ma'am. The jury actually, in the verdict sheet itself, specifically delineated that for Plaintiff Leibson, the period of time for commissions due was August 1st, 2011 through July 23rd, 2012. The commissions due were in the amount of $87,000, $989,000. I'm not talking about the commissions. I'm just talking about the hourly compensation. The hourly? $25,680 for hourly comp, and then under FLISA and New York Labor Law, $25,680 for overtime pay. This was the, as far as I understood it and the way we have proceeded, this was the award for overtime pay? In both cases. Yes, ma'am. Okay. Thank you. They're not one on top of the other. Judge Sullivan. I wanted to ask a quick question about attorney's fees. The Fair Labor Standards Act provides for attorney's fees. New York Labor Law provides for attorney's fees, but a breach of contract claim typically doesn't require attorney's fees. Judge Weinstein cut attorney's fees because he said that you had a mixed result in light of the fact that he reversed the commission's verdict. Why do you get attorney's fees on the breach of contract claims at all? Shouldn't the attorney's fees only be for time spent on the labor law claims and Fair Labor Standards Act claims? Your Honor, in this particular case for three years, that was the specific question. My clients were claiming that there were due commissions and wages. Defendants were claiming . . . Some of your clients were arguing Fair Labor Standards Act, not all of them. Not all. I'm talking regarding specifically to Ms. Thiessen and Ms. Siegel. But the issues here were so inextricably intertwined, and this is the standard for the attorney's fees determination, that there was no way for the case to proceed only on, for example, on the FLSA New York Labor Law claims of only two plaintiffs without involving the entire issue that was underlying it. If it wasn't for the way defendants chose to pay the plaintiffs, claiming that they were paying hourly wages also together with commission, but only to the corporate plaintiffs, it was a . . . Wait. If Thiessen and Siegel hadn't brought Fair Labor Standards Act claims or New York Labor Law claims, then there would be no argument for attorney's fees, right? If there was no FLSA claims? If this was just about commissions, if this was just a contract claim, would you be getting any attorney's fees? I'm not 100% sure on that, Your Honor. All right. Thank you. Very good. Okay. Mr. Labuda, you have three minutes for rebuttal. To answer Judge Sullivan's question, the answer would be no. There would be no attorney's fees with respect to a breach of contract claim. You know, there's a statutory mechanism for FLSA and New York Labor Law claims. I wanted to ask you another New York Fair Labor Standards Act claim, which was your argument that the claims of Thiessen and Siegel should have been dismissed because they didn't file written consent to suit forms. I haven't been doing this this long, only a couple of months, but that has struck me as about the most frivolous argument I've seen so far. What on earth is your basis for saying that they had to file a consent to sue form in a case that's not brought as a . . . Class or collective action? Collective action, not a class. I mean, the statute says that, and there's a case law that we submitted that supports that position, that the named plaintiffs also need to submit . . . And one court said, as odd as it may sound, that's what the interpretation was. So, that's their interpretation. So, with respect to . . . just a few touch points. One, with respect to the breach of contract claim, there's absolutely no evidence in the record with respect to the individual plaintiffs having a contract with the defendants in this case. All the payments were made directly to the corporate plaintiffs, and so, we believe that in addition to what the lower court decided in terms of that there was an assent to additional terms, there's absolutely zero evidence that the individual plaintiffs, that's Siegel, Liefsen, and Pustov, had any type of individual contract. They never got paid. There's no evidence whatsoever of that. And along those same lines, these cases in terms of the at-will contract have come up before, and courts have said that, look, even if you say, I'm going to pay you $20 an hour, and you end up paying the person $15 an hour, the employee, if they continue to work, has assented to those new terms. And that's really no different here. How were the plaintiffs to know what the terms were, in fact, where there were elements of commission, elements of hourly bases, where there was no accounting given, and where the amounts seemed somewhat random? Well, there were commissions that were provided to them. And where the employer kept putting them off, apparently, in terms of any accounting or reconciliation. Well, Your Honor, with respect to that, there were monthly commission reports that were provided to the plaintiffs. Each month they went through them. So there is evidence of that. There was indications on the paychecks that were given that indicated whether or not it was commissions versus services that were rendered. But the doctrine, the concept, is that you have a ratification without failure to timely repudiate. And here you had plaintiffs that continued working month after month, year after year. And then it's only after their employment stopped or when their services stopped that they come and say, oh, look, we had a problem. I'm owed all this additional money, 10%, 35%, whatever it is, 5%, etc. They could have said whatever they wanted to. But the courts say, look, you need to timely repudiate on something. And so effectively what the terms were was that, look, we're going to pay you, and it may be whatever we decide to pay you in terms of commissions, but that may be ultimately what the contract was because they continued to work there. You have people who were working there for over 10 years. And to come back with that timely repudiation is not what the law contemplates. What would have been timely repudiation here? I would say within a few months, Your Honor. If you're not getting paid the way you think you're supposed to get paid, that would be timely repudiation, not years and years, Your Honor. So I'd also just say one other note with respect to the attorney's fees, that there was a demand in the complaint for 25% of the recovery. We believe that if there were any attorney's fees, although we believe that those claims should be dismissed, but if there were, the demand was 25%, and that's what they should be entitled to. And with respect to Your Honor's point about some of these claims, breach of contract or wage claims, it appears that they all are duplicative so that the wage claims mirror the breach of contract claims. And also with respect to Mr. Pustov as well, that mirrors the exact amount of what is determined by the jurors for his corporation, Imperial, $77,500. So I think it's just the jury wasn't exactly sure how to place those amounts. Thank you. I think we have the argument. Yes. All right. Thank you both. We will take the matter under advisement and issue our decision in due course. That concludes our oral arguments for today. We also have one case on submission, United States v. Furbeck, and we will issue a decision in due course there as well. The clerk will please adjourn court. Court is adjourned. Thank you, Your Honor. Thank you.